359 So.2d 586 (1978)
STATE of Louisiana in the Interest of Andrew Leonard DINO.
No. 61283.
Supreme Court of Louisiana.
May 8, 1978.
Rehearings Denied June 15, 1978.
*587 Frederic L. Miller, Peters, Ward & Miller, Francis M. Gowen, Jr., Shreveport, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John A. Richardson, Dist. Atty., Andrew B. Gallagher, Legal Officer, Juvenile Court for Caddo Parish, Shreveport, for plaintiff-respondent.
DENNIS, Justice.
On August 3, 1977 a petition was filed in the Caddo Parish Juvenile Court seeking to have thirteen year old Andrew Leonard Dino, relator, adjudicated a delinquent based on the allegation that he committed the first degree murder of Cynthia Tew on June 26, 1977 in violation of La.R.S. 14:30. Relator denied the allegations contained in the petition.
Prior to the adjudicatory hearing relator filed a motion to suppress an inculpatory statement given to the Shreveport police on the ground that it was obtained in violation of his constitutional rights. Following a five day hearing the juvenile court denied the motion to suppress. The juvenile court also denied relator's motion for a trial by jury and his motion for a public trial.
We granted writs to review the pre-trial rulings of the juvenile court. State of Louisiana *588 in the Interest of Dino, 353 So.2d 1334 (La.1978).

Waiver of Rights by a Juvenile
During the late afternoon of June 26, 1977 the parents of nine year old Cynthia Tew discovered that she was missing from home. Several residents in the neighborhood, including relator Andrew Dino, commenced a search for her. Early that evening the relator reported that he had found Cynthia, critically injured, in a wooded area behind the Tew and Dino houses. Cynthia was taken to the hospital and died shortly thereafter from severe head wounds without regaining consciousness.
The police began an investigation which extended over a period of about six weeks. Because relator was the one who discovered Cynthia the police were in frequent contact with him and his parents during the investigation. However, during the initial stages of the investigation the relator was regarded merely as a potential witness, rather than as a suspect, by the police.
On July 8, 1977, the relator at the request of the investigating officers went to the police station with his parents and gave the police a "witness informational" statement. On this occasion he did not implicate himself in the crime. His parents were not present in the room during the taking of the statement, which was recorded. Because of discrepancies between Andrew's statement and information from other sources, it was agreed that Andrew should take a polygraph test to clarify his earlier statement and to eliminate him as a potential suspect.[1] One test was cancelled by Andrew's father because of the youth's nervousness. Another test was scheduled but never performed when the polygraph examiner went on vacation.
On August 1, 1977 Andrew's father gave a witness statement to the police. Mr. Dino's account of Andrew's activities on the afternoon in question differed from that of his son. One of the officers testified that Andrew definitely became a suspect at this time.
On the afternoon of August 2, 1977, Andrew awoke from a nap and a bad dream. He told his mother he remembered being in the woods with Cynthia, that something "blue" had come toward them, and that he ran away leaving Cynthia alone. Mrs. Dino called one of the officers with whom she had become acquainted during the investigation and told him what Andrew had said. She asked the officer to come talk with Andrew after her husband came home from work. However, at the insistence of the officer Mrs. Dino agreed to bring Andrew to police headquarters. The officer agreed to leave word at her husband's office for him to join his wife and son at the stationhouse. Mrs. Dino attempted to call the family attorney to ask for advice before leaving her house, but he was not in.
Upon arrival at the station Andrew was taken into an office by the chief of police and one of the investigating officers. Mrs. Dino was left to wait in a separate room and was not asked if she wished to be present while they talked to Andrew. She was not told that the investigation had focused on Andrew as a suspect. She was not informed of her son's constitutional rights or given an opportunity to confer with him about whether he should give a statement without consulting a lawyer. Because they had not previously met the chief of police, Mrs. Dino and Andrew were asked if they objected to his presence during the interrogation. No objection was made, and no other conversation occurred before the interrogation began.
Apparently, the youth was not told either that he was free to leave or required to remain during questioning. According to the record Andrew was in the office with the chief of police and the other officer for approximately four to eight minutes. During this short period of time, the officers testified, Andrew read and listened to explanations *589 of his constitutional rights, he waived his rights both orally and in writing, and he gave them an oral inculpatory statement. The officers' testimony was not detailed as to the oral explanation or the means by which it was determined that the warnings were fully understood by the thirteen year old youth. Contrary to the testimony of the officers, Andrew testified that they gave no explanation of his rights and that he did not understand what was on the paper signed by him. At the motion to suppress hearing a psychiatrist and a clinical psychologist testified that Andrew was incapable of understanding the language contained on the standard waiver form, but that he could have comprehended a statement of constitutional rights phrased in simpler terms. From our review of the officers' testimony it appears that the warnings given the youth were either quoted or paraphrased from a standard waiver form.
After the statement was given, the police informed Mrs. Dino that Andrew had confessed to the murder and asked her to sign the waiver card. She signed it without reading the warnings. Mr. Dino arrived at the station shortly after these events transpired. The youth was not allowed to leave the stationhouse with his parents but was placed in confinement in the juvenile detention center.
The constitutional privilege against self-incrimination and the rights to counsel and to confront and cross-examine witnesses are applicable in the case of juveniles as they are with respect to adult accuseds.[2] Article I, § 13 of the 1974 Louisiana Constitution requires that any person arrested or detained in connection with the investigation or commission of any offense must be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. By the adoption of this provision Louisiana enhanced and incorporated the prophylactic rules of Miranda v. Arizona,[3] which in essence require that the state, before it may use a confession at trial, establish that a defendant was informed of his right against self-incrimination and to have an attorney present at the interrogation; that he fully understood the consequences of waiving those rights; and that he did in fact waive those rights voluntarily and without physical or mental coercion.[4] This protection must have been given "when the individual [was] first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way."[5]
The State raises a threshold issue by contending that the warnings required by Miranda and Article 1, § 13 of our constitution do not come into play in the instant case because the youth was brought to the police station and placed in an office with his interrogators through the voluntary action of his own mother. Perhaps in recognition that the circumstances surrounding young Dino rather plainly qualified him as a person who had been taken into custody or otherwise deprived of his freedom of action in a significant way, the State relies primarily upon the Supreme Court's decision in Oregon v. Mathiason,[6] which may to some extent modify Miranda.[7]
The State's arguments must be rejected for several reasons. First, the precedent relied upon is distinguishable on its facts from the circumstances involved in Dino's interrogation. In Mathiason the Court held that police were not obliged to administer warnings to an adult parolee who came to the stationhouse at the request *590 of a policeman to answer questions about his possible involvement in a recent burglary under investigation. Heavily emphasizing that Mathiason voluntarily came to the stationhouse as a possible suspect and was allowed to leave without hindrance when the questioning was over, the Court held that this was not the sort of coercive environment to which Miranda applies. The ingredients of the instant case are significantly different. The relator became the primary suspect in the murder investigation when the police learned of his admission to being in the woods with the victim before she was attacked. It cannot be said that young Dino, who was only thirteen years old and subject to the legal custody of his parents, acted voluntarily when he was brought to the stationhouse by his mother. Nor could one conclude realistically that he was not deprived of his freedom of action in a significant way when he was closeted with two adult policemen in the interrogation room, without counsel, parents, or friends. Insofar as the record reflects, young Dino was not "streetwise" and did not have any previous experience as a juvenile accused. The youth was never told that he was free to leave the police station, and he was placed in confinement immediately after his confession was taken. Second, if Mathiason represents a constriction of the Miranda definition of significant deprivation of freedom of action, its holding clearly does not govern our interpretation of Article I, § 13 of the 1974 Louisiana Constitution whose framers intended to adopt the Miranda edicts full-blown and unfettered.[8] Finally, it appears that, in fact, there was an intention by the convention to go beyond Miranda and to require more of the State regarding the precise issue now under discussion. In Article I, § 13 the cautions are triggered and must be given "when any person has been arrested or detained in connection with the investigation or commission of any offense." The use of "detained" in addition to "arrested" was intended to prevent a narrow construction of the latter term.[9]
It is well settled under Miranda and our state constitution that if a statement is taken without the presence of an attorney, under circumstances in which the warnings are required, a heavy burden rests on the State to demonstrate that the accused knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.[10] Since the warnings were required before a statement could be taken in the instant case, the State must discharge a heavy burden in order to prove a valid waiver of his constitutional rights by young Dino.
This Court has not expressly stated under what circumstances a juvenile may be deemed to have knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.[11] One Louisiana court of appeal[12] has taken the position that the age of a person under interrogation does not necessarily require additional protections and has employed a "totality of circumstances" test similar to that articulated in West v. United States.[13] That test consists of an illustrative list of factors to be considered in determining *591 whether a juvenile has knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel:
"* * * 1) age of the accused; 2) education of the accused; 3) knowledge of the accused as to both the substance of the charge, if any has been filed, and the nature of his rights to consult with an attorney and remain silent; 4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; 5) whether the accused was interrogated before or after formal charges had been filed; 6) methods used in interrogation; 7) length of interrogations; 8) whether vel non the accused refused to voluntarily give statements on prior occasions; and 9) whether the accused has repudiated an extra judicial statement at a later date." 399 F.2d 467, 469.
The totality of circumstances in the instant case shows, inter alia, that Andrew's knowledge and education pertaining to his constitutional liberties were no greater than that of an average thirteen year old Louisiana youth; that he was not allowed to consult with relatives, friends or an attorney during the interrogation; that he was interrogated before formal charges had been filed and without being told that the investigation had focused on him as the primary suspect; that he was interrogated in an office at the police station by the chief of police and another officer; that the interrogation itself lasted no longer than eight minutes, but it occurred after an intensive six-week investigation involving many previous contacts between relator and the police, and it followed closely his awakening from a frightening dream related to the murder incident; that the youth had not refused to give statements on prior occasions, but his father had cancelled a lie detector test because of his emotional condition; and that Andrew had repudiated the waiver of his rights. Thus the factors of the present case raise grave doubts as to whether there was real understanding and intelligent exercise of the constitutional liberties. Accordingly, were we to rely solely upon the totality of circumstances test in this case, we would conclude that the State has not carried its heavy burden in proving that young Dino was aware not only of his rights, but also of the consequences of foregoing them, that he knew he was faced with a phase of the adversary system, and that he was aware that he was not in the presence of persons acting solely in his interest.[14]
However, exclusive use of the totality of circumstances test in relation to waivers by juveniles tends to mire the courts in a morass of speculation similar to that from which Miranda was designed to extricate them in adult cases. Although the Miranda court did not express itself specifically on the special needs of juveniles confronted with police interrogation, the reasons given for making the warnings an absolute prerequisite to interrogation point up the need for an absolute requirement that juveniles not be permitted to waive constitutional rights on their own. The Court stated:
"The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time." 384 U.S. 436, 468-9, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694, 720. "* * *
"No amount of circumstantial evidence that the person may have been aware of *592 this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right." 384 U.S. 436, 471-2, 86 S.Ct. 1602, 1626, 16 L.Ed.2d 694, 722.
Similarly, the rights which a juvenile may waive before interrogation are so fundamental to our system of constitutional rule and the expedient of requiring the advice of a parent, counsel or adviser so relatively simple and well established as a safeguard against a juvenile's improvident judicial acts,[15] that we should not pause to inquire in individual cases whether the juvenile could, on his own, understand and effectively exercise his rights. Assessments of how the "totality of the circumstances" affected a juvenile in a particular case can never be more than speculation. Furthermore, whatever the background of the juvenile interrogated, assistance of an adult acting in his interest is indispensable to overcome the pressures of the interrogation and to insure that the juvenile knows he is free to exercise his rights at that point in time.[16]
The presence of a parent, counsel, or other adult acting in the juvenile's interest at the interrogation may serve several significant subsidiary functions as well. If the juvenile decides to talk to his interrogators, the assistance of an adult can mitigate the dangers of untrustworthiness. With an adult acting in his interest present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the adult can testify to it in court. The presence of such an adult can also help to guarantee that the accused gives a fully accurate statement and that the statement is rightly reported by the prosecution at trial.[17]
Moreover, such a rule will relieve the police from having to make a subjective judgment in each case. As noted by the Indiana Supreme Court in Lewis v. State, 259 Ind. 431, 288 N.E.2d 138, 141 (1972):
"The authorities seeking to question a juvenile enter into an area of doubt and confusion when the child appears to waive his rights to counsel and against self-incrimination. They are faced with the possibility of taking a statement from him only to have a court later find that his age and the surrounding circumstances precluded the child from making a valid waiver. There are no concrete guidelines for the authorities to follow in order to insure what the waiver will be upheld. The police are forced to speculate as to whether the law will judge this accused juvenile on the same plane as an adult in regard to the waiver of his constitutional rights, or whether the court will take cognizance of the age of the child and apply different standards.
"* * *
"* * * It is harmful to the system of criminal justice to require law enforcement authorities to second guess the courts in the area of constitutional rights. Clearly defined procedures should be established in areas which lend themselves to such standards in order to assure both efficient police procedure and protection of the important constitutional rights of the accused. Age is one area which lends itself to clearly defined standards."
One study indicates that many law enforcement officers in Louisiana are presently following this procedure.[18]
*593 Although a majority of jurisdictions allow a juvenile to waive his privilege against incrimination and his right to counsel without mature guidance,[19] a growing number of courts and scholars recognize that a more ascertainable assurance of a knowing and intelligent waiver of constitutional rights should precede juvenile interrogation.[20]
The courts of Pennsylvania, Indiana and Georgia, for example, have recently concluded that the administering of Miranda warnings to a juvenile, without providing an opportunity to consult with a mature, informed individual concerned primarily with the interest of the juvenile, is inadequate to offset the disadvantage occasioned by youth.[21] Moreover, the Pennsylvania Supreme Court has held that the impediment of immaturity can only be overcome where the record establishes that the youth had access to the advice of an attorney, parent or other interested adult, and that the consulted adult was informed as to the constitutional rights available to the minor and aware of the consequences that might follow the election to be made.[22]
Some "sophisticated" juveniles, without the benefit of adult advice, may understand the serious consequences flowing from a waiver of constitutional rights. However, one empirical study indicates that a large percentage of juveniles are incapable of knowingly and intelligently waiving constitutional rights.[23] In any event, it is the general policy of our law to protect all minors from the possible consequences of immaturity.[24]
*594 Because most juveniles are not mature enough to understand their rights and are not competent to exercise them,[25] the concepts of fundamental fairness embodied in the Declaration of Rights of our constitution[26] require that juveniles not be permitted to waive constitutional rights on their own. For these reasons we hold that in order for the State to meet its heavy burden of demonstrating that a waiver is made knowingly and intelligently, it must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination.[27]
Accordingly, the purported waiver by a juvenile must be adjudged ineffective upon the failure by the State to establish any of three prerequisites to waiver, viz., that the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was interested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile. In the instant case the record establishes that Andrew Dino's mother, who was interested in his welfare, was present at the police station during the interrogation. However, the State did not show that Mrs. Dino was fully advised of her juvenile son's rights or that Andrew actually consulted with her in waiving his rights. We are therefore constrained to conclude that the statement should have been suppressed.

Public Trial
In conformity with the provisions of La. R.S. 13:1574 the petition in this case alleges that Andrew Dino is a delinquent child in that he committed an act in violation of La.R.S. 14:30, first degree murder, before attaining the age of fifteen years.[28] If found guilty of violating any law he could be committed to the Louisiana Department of Corrections[29] until he reaches the age of twenty-one years.[30] Because he faces a significant period of confinement, Dino contends that he is guaranteed a public trial by our state constitution on the issue of guilt or innocence. In opposition, the State relies upon portions of the Louisiana Juvenile Court Act which provide that in all cases of children within the jurisdiction of the juvenile court "[t]he general public shall be excluded" from adjudicatory hearings.[31] This statutory scheme conclusively prevents a juvenile who is alleged to have committed a criminal offense from demanding a public trial. The issue of whether this legislation is permitted by the Louisiana Constitution of 1974 is squarely presented.
*595 In the fiscal year 1976-77, 1,055 juveniles were committed to the Louisiana Department of Corrections.[32] If a juvenile is over the age of thirteen a determination that he has violated any law or ordinance may result in his commitment to the Department of Corrections until he reaches the age of twenty-one years.[33] For a child under thirteen years of age a finding that he committed a felony may bring the same consequence.[34] However, a juvenile cannot be confined for a period which exceeds the length of time for which an adult could be confined if convicted of the offense which formed the basis for the adjudication of delinquency.[35] Upon request of the Department of Corrections, a judge may authorize the Department to transfer any committed male of the age of fifteen years or over, whom the Department has determined to be incorrigible, to the Louisiana Correctional and Industrial School, an adult correctional institution.[36] Failure of the judge to act on the request within thirty days authorizes the Department to effect the transfer within its own discretion.[37] A judge also may transfer, upon recommendation of the Department, any juvenile "to such other agency or facility which may be available to best serve the needs of the juvenile." [38]
The consequences which can result from a juvenile adjudication are much more severe than the legal and social sanctions which flow from many offenses committed by adults who are entitled to a public trial.[39]
Although a child less than fifteen years of age who is accused of a capital offense is not exposed to capital punishment, a determination of his culpability may subject him to harsh consequences. He can be confined until his twenty-first birthday, bringing on the additional possibility of his transfer to an adult penal institution. In cases involving homicides or other heinous crimes, a judge may be reluctant to exercise his authority to discharge a child or to release him under supervision before his twenty-first birthday.[40] The opprobrium attached to such a delinquent act is likely to be as severe as that which follows from similar conduct by adults.
A judicial proceeding which may result in the removal of a child from the custody of his parents and in his confinement until the age of twenty-one years is not essentially different from a criminal trial. The purpose of the juvenile adjudicatory proceeding is to decide whether the accused is responsible for prohibited conduct and, when based on a criminal violation, the consequences may be in effect the same as in the case of an adult. Indeed, it is even possible that ultimately it could result in the juvenile being incarcerated in a penal institution with adult offenders.[41] This contingency was noted in In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In discussing the importance of Fifth Amendment protection against self-incrimination in delinquency proceedings, because *596 the characterization of the proceedings as "civil" or the supposition that they possess a benevolent quality does not work a change in their nature, the Court observed:
"It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to `criminal' involvement. In the first place, juvenile proceedings to determine `delinquency,' which may lead to commitment to a state institution, must be regarded as `criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the `civil' label-of-convenience which has been attached to juvenile proceedings. Indeed, in over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult `criminals.' In those States juveniles may be placed in or transferred to adult penal institutions after having been found `delinquent' by a juvenile court. For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called `criminal' or `civil.' * * *" 387 U.S. 1, 49-50, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527, 558 (footnotes omitted).
The Supreme Court's reasons for finding the slight differences between adult and juvenile confinement in Arizona to be of "no constitutional consequence" are equally applicable to the Louisiana correctional system. The Court stated:
"Ultimately, however, we confront the reality of that portion of the Juvenile Court process with which we deal in this case. A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence and of limited practical meaning that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a `receiving home' or an `industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes `a building with whitewashed walls, regimented routine and institutional hours . . . .' Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and `delinquents' confined with him for anything from waywardness to rape and homicide." 387 U.S. 1, 27, 87 S.Ct. 1428, 1443, 18 L.Ed.2d 527, 546.
For these reasons the Court introduced into the juvenile process all the elements necessary to make the adjudicatory hearing into an adversary process the right to counsel, the right to confront and cross-examine witnesses, and the privilege against self-incrimination.[42] Because the consequences which confront a child who is alleged to have committed a criminal offense are essentially the same as those faced by adult criminal defendants, the protections which may be afforded by a public trial in juvenile proceedings corresponding to criminal cases are of great importance.
A brief consideration of the underlying reasons for the right to a public trial convinces us that it is of fundamental importance in any adversary proceeding which may lead to confinement. The Supreme Court, in holding that the public trial guaranty is applicable to the states through the due process clause of the Fourteenth Amendment, in In Re Oliver,[43] stated:
"The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political *597 and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society,24 the guarantee has always been
24 "Other benefits attributed to publicity have been: (1) Public trials come to the attention of key witnesses unknown to the parties. These witnesses may then voluntarily come forward and give important testimony. 6 Wigmore, Evidence § 1834 (3d ed. 1940); Tanksley v. United States, 145 F.2d 58, 59, 156 A.L.R. 257.
"(2) The spectators learn about their government and acquire confidence in their judicial remedies. 6 Wigmore, Evidence, § 1834 (3d ed. 1940); 1 Bentham, Rationale of Judicial Evidence 525 (1827); State v. Keeler, 52 Mont. 205, 156 P. 1080; 20 Harv.L.Rev. 489."
recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power. "* * *
"* * * In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus sentenced to prison."
333 U.S. at 268-70, 273, 68 S.Ct. 505-6, 507, 92 L.Ed. 682, 691-2, 694. (Other footnote omitted.)
In the same vein the Court later observed in Estes v. Texas [44] that the constitutional guarantee of public trial is to insure that "the accused would be fairly dealt with. . . ."[45]
Accordingly, the right to a public trial is one of the fundamental rights in the American scheme of justice and it is included in the constitutions of both the United States and the state of Louisiana because it works analogously to a jury trial to protect the accused from possible oppression by exposing improper judicial behavior to the indignation of the community at large.[46] For the reasons assigned we conclude that a public trial is also among the essentials of due process and fair treatment required by Article 1, § 2 of the 1974 Louisiana Constitution during the adjudication of a charge of delinquency based upon acts that would constitute a crime if engaged in by an adult.[47] We hold therefore that La.R.S. 13:1579(B) is unconstitutional insofar as it prohibits a juvenile from electing a public trial in adjudicatory proceedings based on criminal charges which would entitle an adult accused to have his trial conducted in public.

Jury Trial
The juvenile court determined that a person in relator's circumstances is denied the right to a jury trial by La.R.S. 13:1579(A), which, in pertinent part, provides:
"All cases of children shall be heard separately from the trial of cases against adults and shall be tried without a jury. * * *"
For a majority of this Court, the only question presented by this ruling is whether a jury trial is among the essentials of due process and fair treatment required during juvenile adjudicatory proceedings. A majority *598 of the United States Supreme Court, in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), held that the due process clause of the Fourteenth Amendment does not impose the Sixth Amendment right to jury trial upon the states in juvenile delinquency proceedings. For reasons similar to those expressed in McKeiver, a majority of this Court has concluded that the Louisiana due process guaranty, La.Const.1974, Art. 1, § 2, does not afford a juvenile the right to a jury trial during the adjudication of a charge of delinquency based upon acts that would constitute a crime if engaged in by an adult.[48]

Conclusion
For the reasons assigned, the orders of the juvenile court denying relator's motion to suppress and motion for a public trial are vacated. The order denying relator's motion for a jury trial and the other rulings below are affirmed.[49] The case is remanded to the juvenile court for further proceedings consistent with the opinion herein.
SANDERS, C. J., concurs in part and dissents in part with written reasons.
MARCUS, J., dissents in part and concurs in part for reasons assigned by SANDERS, C. J.
SUMMERS, J., dissents in part and concurs in part for the reasons assigned.
DENNIS, J., with whom DIXON and CALOGERO, JJ., join, dissents in part and concurs in part.
DIXON and CALOGERO, JJ., agree with the majority opinion except for the disposition of the jury trial question, and join in dissent of DENNIS, J.
SANDERS, Chief Justice (concurring in part and dissenting in part).
I concur in the holding that LSA-R.S. 13:1579 A, providing for the hearing of children's cases without a jury is constitutional. In the absence of a constitutional infirmity, the expression of legislative will is entitled to full recognition. I must dissent, however, from the two remaining holdings: (1) that a public trial is required under the Due Process Clause of the Fourteenth Amendment and, consequently, that LSA-R.S. 13:1579 B is unconstitutional; (2) that the inculpatory statement is inadmissible and should be suppressed.

PUBLIC TRIAL
The juvenile court is geared to the philosophy of rehabilitating each child and protecting the public from delinquent behavior. Basic to this philosophy is the concept of "parens patriae" the power of the state through the court to act in behalf of the child as a wise parent would.
The juvenile proceeding is noncriminal. If adjudicated a delinquent, the child becomes a ward of the court. For correctional purposes, the maximum disposition is commitment to the Department of Corrections for placement in a juvenile training school for an indefinite period, but in no case beyond the age of twenty-one. LSA-R.S. 13:1580 A(2)(a). LSA-R.S. 13:1579 A provides for the use of civil procedures. LSA-R.S. 13:1580 B expressly provides:
"No adjudication by the court upon the status of any child shall operate to impose any of the civil disabilities ordinarily resulting from conviction, nor shall any child be deemed a criminal by reason of such adjudication, and such adjudication shall not be deemed a conviction. The disposition of a child or any evidence given in the court shall not operate to disqualify the child in any future civil service application or appointment."
*599 Since the proceeding is noncriminal, the public trial requirement of the state and federal constitutions does not apply. The public trial provision of the state constitution (Art. 1, § 16) applies only to a "person charged with a crime." The public trial provision of the United States Constitution (6th Amendment) applies only to "criminal prosecutions."
As late as 1971, the United States Supreme Court pointed out in McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647, that there is no constitutional requirement that all the procedures of a criminal trial be imposed in a juvenile hearing.
The Legislature has wisely accorded the judge considerable discretion in regulating attendance at a juvenile hearing.
LSA-R.S. 13:1579 B provides:
"The general public shall be excluded from hearings under this section. Only the child, his counsel, witnesses, the child's parents, tutor or other custodian, the officers of the court, and any other persons as the court finds have a legitimate or proper interest in the proceedings or in the work of the court may be admitted by the court. The court may exclude any person from the hearing if such person's conduct is disruptive of orderly proceedings and the court's admonition to conduct himself properly is not heeded promptly."
In my opinion, the statute is constitutional.

INCULPATORY STATEMENT WAIVER OF RIGHTS
The decision today establishes three iron rules concerning the admission of a confession of a person under seventeen years of age:
(1) that the juvenile actually consulted with an attorney or an adult before waiving his right to silence;
(2) that the attorney or adult consulted was interested in the welfare of the juvenile;
(3) if an adult other than an attorney is consulted, the adult also must be fully advised of the rights of the juvenile.
I recognize that in most instances the presence of a parent during the questioning of a child is the better practice. I am not prepared, however, to fasten upon our law enforcement officers the inflexible rules announced in the present case. Under them, when parents are unavailable, an investigation must be halted. The requirement of the presence of an attorney adds one more costly burden to our already heavily burdened justice system. Finally, the question of whether the attorney or adult is "interested in the welfare of the juvenile" creates a troublesome issue to baffle the courts. In the rush of an investigation, how are law enforcement officers to determine the requisite interest?
As the majority notes, the prevailing rule is that a juvenile may waive his right to silence without parental guidance or the presence of counsel. The validity of the waiver and voluntariness of the confession are determined from the totality of the circumstances. See, e. g., State v. Gullings, 244 Or. 173, 416 P.2d 311 (1966); Mosley v. State, 246 Ark. 358, 438 S.W.2d 311 (1969); People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. denied 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968); State v. Roberts, Fla.App., 274 So.2d 262 (1973); West v. United States (5th Cir.) 399 F.2d 467 (1968); American Law Institute, Model Code of Pre-Arraignment Procedure, pp. 361-362 (1975).
In State v. Gullings, supra, the Oregon Supreme Court stated:
"It can not be said that a juvenile can not waive constitutional rights as a matter of law. It may be more difficult to prove because of his age, but it is a factual matter to be decided by the trial judge in each case."
This Court has heretofore aligned itself with the majority rule. See, e. g., State v. Ross, La., 343 So.2d 722 (1977); State v. Sylvester, La., 298 So.2d 807 (1974); State v. Melanson, La.App., 259 So.2d 609 (1972).
In State v. Ross, supra, this Court stated:

*600 "Before a written confession can be introduced in evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, inducements or promises. La.R.S. 15:451; La.Code Crim.P. art. 703(C). It must also be established that an accused who makes a confession during custodial interrogation was first advised of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A confession need not be the spontaneous act of the accused and may be obtained by means of questions and answers. La.R.S. 15:453; State v. Simmons, 340 So.2d 1357 (La.1976). While close scrutiny is required in determining whether the state has met its heavy burden of demonstrating that the confession of a juvenile was free and voluntary, we have held that the age of a defendant does not of itself render a confession involuntary. State v. Sylvester, 298 So.2d 807 (La.1974). The voluntariness of the confession is a question of fact. State v. Demourelle, 332 So.2d 752 (La.1976); State v. White, 321 So.2d 491 (La.1975)."
I would adhere to our prior jurisprudence, holding that the validity of a waiver and the voluntariness of the ensuing confession depend upon the totality of the circumstances. Among the factors to be considered are age, intelligence, opportunity to consult with parents or an attorney, and length of questioning.
The background facts are these. A nine-year-old girl was found fatally beaten in a wooded area in Shreveport. Andrew Leonard Dino, a thirteen-and-one-half-year old neighbor of the deceased "found" the body and pointed it out to the police.
On July 8, 1977, Andrew, who was not then a suspect, came to the police station with his parents and with their consent gave a statement concerning the incident. When the questioning was completed, they departed.
On August 1, 1977, the father likewise gave a statement to the police.
On August 2, 1977, Andrew made a statement to his mother indicating that he might know something about the crime. His mother then called one of the police officers and asked him to talk to her son. She agreed to bring him to the police station. At her request, the officers called her husband's office, leaving word for him to join them at police headquarters.
Upon arrival at the police station, Mrs. Dino waited in a separate room while the officers talked to her son. The officers explained to Andrew all of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Within not more than eight minutes, he gave an oral inculpatory statement. After the statement had been given, the police informed the mother that he had confessed. The father arrived shortly thereafter.
It is evident from the statement of facts that the questioning was initiated at the suggestion of the mother and that there was no coercion, pressure, or prolonged questioning. While the mother was not in the immediate presence of her son, she was in an adjoining room, readily available.
In ruling the confession admissible, the able juvenile court judge stated:
"In deciding this question, the Court will comment upon a few things concerning Andy and the conduct of this hearing. Andy Dino has been referred to continuously throughout these proceedings by counsel as Little Andy, and from the Court's observation of Andy he is not small for his age, he is an average-size thirteen or fourteen year old young man. And from his demeanor during these proceedings it is apparent that he is very attentive as to what is going on and appears to comprehend what is happening before him.
"On August 2nd, when Andrew made the inculpatory or self-incriminating statement, he had not been taken into custody at that time. He had not been in detention. He had not been subjected to interrogation for a long period of time. But, to the contrary, had been brought to *601 the police station by his mother after she had called to request that Detective Brann talk with him, and on the suggestion of Detective, I believe it was Morgan, he was brought to the station for this purpose or for this interview.
"Upon arriving, the mother went into another office with one detective and Andy went into the office with Detective Brann and Chief Lanigan. Detective Brann started the interview with Andy, whereupon the Chief interrupted and explained the necessity for the reading of Andy his rights, whereupon Detective Brann obtained a card, a rights card as it is referred to, and basically this card was recited to Andy by Detective Brann, and it concluded with the statement: `Do you wish to make a statement and tell how this happened.' And, according to the evidence, after this statement was made, Andy responded and made his inculpatory or self-incriminating statement. From this Court's experience, having had the responsibility to explain these rights to juveniles and seeing their reaction in Court, and testing their ability to understand, it is our opinion that a juvenile of Andy's mentality and his capabilities and his age is well capable of understanding his rights, with such an explanation having been given him."
The juvenile court judge's ruling on the voluntariness of a confession is entitled to great weight. I find no adequate reason in the record to disturb the ruling.
For the reasons assigned, I concur in the holding that no jury trial is required but otherwise dissent.
SUMMERS, Justice (concurring in part and dissenting in part).
I agree that in this case of a thirteen-year-old juvenile the inculpatory statement he gave officers outside the presence of his parents, tutor, custodian or an attorney should be suppressed. I do not agree, however, that such a result should follow automatically in every case involving every juvenile. As the majority opinion concedes, some "sophisticated" juveniles, without the benefit of adult advice, may understand the serious consequences flowing from a waiver of constitutional rights.
Inasmuch as the majority was able to come to the conclusion upon the totality of the circumstances test in this case that the State had not carried its heavy burden in proving that young Dino was aware not only of his rights, but also of the consequences of foregoing them, an adequate basis for suppressing the inculpatory statement had been found. It was unnecessary, therefore, to adopt a dogmatic approach and formulate a rule which categorically invalidates every confession of all juveniles regardless of age unless attended and advised at the time by an adult or attorney having an interest in the juvenile.
The totality of circumstances tests contemplates age and maturity of the juvenile as one of the principal factors to be considered in determining the voluntariness of an inculpatory statement or confession. In this sensitive and complex field of the law involving juveniles, judicial restraint and a wise regard for legislative prerogatives should make it clear that such matters are more properly the concern of the legislature.
If wisely applied the totality of circumstances test is entirely adequate to protect the rights of the juvenile, uphold constitutional due process and at the same time permit the State to maintain a measure of control over the delinquent juvenile and protect the public from his offenses.
Provisions of the Juvenile Court Act which require that the general public be excluded from adjudication hearing involving juveniles are not unconstitutional. La. Rev.Stat. 13:1579 B. The child, his counsel, witnesses, the child's parents, tutor or other custodian, the officers of the court, and any other persons which the court finds has a legitimate or proper interest in the proceedings or in the work of the court may be admitted. Ibid. 1579 B. Only widespread publicity and morbid curiosity are prohibited in the interest of the juvenile. All those primarily interested in the welfare of the juvenile may attend.
*602 It is evident that such a provision is designed for the protection of the juvenile. By these safeguards limiting attendance, undue publicity and notoriety are avoided and the child's future is not blemished or impaired by his juvenile record. In the absence of a showing of undue prejudice in a particular case, and none has been shown here, there is no reason to declare this statute unconstitutional. As presently structured the Juvenile Court Act presents no threat of a secret trial. Adequate assurances are contained in the Act that the juvenile will be fairly dealt with.
I would uphold the constitutionality of the Act against the charge that it deprives the juvenile of a public trial.
I agree that the juvenile is not entitled to jury trial.
DENNIS, Justice, with whom DIXON and CALOGERO, JJ., join, dissenting in part and concurring in part.
I join in the reasons and holding of the majority opinion pertaining to the waiver of rights by juveniles and the right to public trial. I respectfully dissent from the part of the opinion and the holding relating to the right to jury trial.
Article 1, § 3 of the 1974 Louisiana Constitution guarantees all persons equal protection of the laws and prohibits arbitrary, capricious or unreasonable discrimination against a person because of age or certain other physical and intellectual characteristics.[1] By prohibiting such discrimination because of age, it was the intention of the delegates to the constitutional convention to forbid, at least, unreasonable classifications that do not have the support of a rational basis.[2]
Louisiana has established classifications based on age in determining whether a person accused of a crime shall be entitled to a jury trial before being subjected to confinement or other punishment. A person accused of a capital offense or attempted aggravated rape who is fifteen years of age or older is entitled to be tried before a jury of twelve persons, all of whom must concur to render a verdict.[3] A person under fifteen years of age alleged to be delinquent because he committed such an act is entitled only to a trial before a juvenile court judge.[4] A person seventeen years of age or older who is charged with an offense punishable by confinement for more than six months is entitled to a jury trial.[5] A person under seventeen years of age, except in instances when he may be charged as an adult with a capital offense or attempted aggravated rape, may not have a jury determine whether he violated a law.[6]
The right to a jury trial is guaranteed by our state constitution to any person in a case in which the punishment may be confinement for more than six months.[7] The average term of juvenile confinement in *603 Louisiana is well in excess of six months.[8] In basing the right on the possibility of confinement for six months, Louisiana has chosen to incorporate substantially the jury trial guaranty of the Sixth Amendment to the United States Constitution as set forth in Duncan v. Louisiana.[9] In that decision and in a companion case[10] the Court set forth the rationale that a jury trial should be afforded to any person charged with a serious offense or upon whom the government seeks to impose a severe period of confinement. The underlying reasons for finding that the Sixth Amendment right to a trial by jury is afforded in state courts by virtue of the due process clause of the Fourteenth Amendment were eloquently stated by the Duncan majority as follows:
"The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. The deep commitment *604 of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States." (footnote omitted) 391 U.S. 145, 155-6, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491, 499-500 (1968).
All these reasons prevention of oppression by government; protection against unfounded charges and arbitrary action; a safeguard against the corrupt or overzealous prosecutor and against the compliant, biased or eccentric judge; a reluctance to entrust plenary powers over life and liberty of the citizen to one judge or group of judges; fear of unchecked power; insistence on community participation in the determination of guilt or innocence; defense against arbitrary law enforcement argue with equal force for granting the jury trial safeguard to a child who is alleged to have committed an offense which would be triable by a jury in an adult criminal prosecution.
Read as a whole the Declaration of Rights article of our state constitution provides further support for the proposition. Aside from the provision forbidding deprivation of liberty except by due process of law, La.Const. 1974, art. 1, § 2, and the jury trial guaranty in cases in which the punishment may be confinement for more than six months, La.Const.1974, art. 1, § 17, our constitution declares that "[n]o person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review . . . ." La.Const.1974, art. 1, § 19. The fact that the right to judicial review was granted to enforce strenuously all other constitutional rights for any person deprived of liberty or rights suggests that a juvenile subjected to confinement or forfeiture of rights has all of the constitutional rights sought to be protected, including the right to a jury trial.
As pointed out in the majority opinion, a juvenile who is alleged to have committed a serious crime is confronted with consequences not essentially different from those faced by adult criminal defendants confinement within the discretion of the juvenile judge until age twenty-one under conditions similar to those in adult prisons; possible transfer to an adult prison; social and economic stigma of indefinite duration. Thus a child who should suffer one of the possible abuses of official power catalogued in Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), could be severely and irreparably damaged. Consequently, a statutory scheme which denies the right of jury trial to a juvenile who is alleged to be delinquent because of the commission of a serious criminal offense and faces the prospect of incarceration in an institution which is essentially the same as a penitentiary for adult criminals, while an adult alleged to have committed the same offense is entitled to a jury trial, is arbitrary, capricious and does not have the support of a rational basis.
A statutory denial of a jury trial to juveniles in such cases cannot be justified on the theory that it is essential to the preservation of the rehabilitative characteristics of the juvenile justice system. The Louisiana Juvenile Court Act encompasses most of the characteristics which distinguish juvenile courts established as a result of the nineteenth century wave of humanitarian reform which swept the nation: informal, nonpublic hearings; confidential records; separate detention of children; special courts and judges; and a staff of probation officers.[11] However, as in many other modern juvenile court statutes, the legislature has separated the proceedings into two phases: adjudicative and dispositional.[12]
*605 The United States Supreme Court has introduced into the juvenile process all the elements necessary to make the adjudicatory hearing into an adversary process the right to counsel, the privilege against self-incrimination, and the right to confront and cross-examine witnesses.[13] If it ever had validity, the argument that jury trial would deprive judges of the flexibility needed to institute plans for rehabilitation is now obsolete.[14] The need for flexibility exists primarily on the dispositional side, where the judge takes into consideration social and psychological factors, family background, and education in order to shape the disposition in the best interest of both the child and society. Assuring to the juvenile his right to a jury trial will not prevent the juvenile court judge from applying his unique qualifications in the dispositional process. Opportunities for such worthwhile purposes are abundant both before and after the adjudicatory proceeding in cases where the juvenile has elected to deny the petition and put the State to its proof.[15]
Even if a conflict existed between jury trials and the rehabilitative goals of the juvenile court act, it would not justify a failure to enforce a juvenile's right to equal protection of the laws. The benevolent social theory supposedly underlying juvenile court acts does not provide an adequate premise for dispensing with constitutional safeguards.[16] Although it is unnecessary to consider the federal constitutional question of whether the Sixth Amendment right to a jury trial extends to all serious juvenile offenses, I find a great deal of merit in Justice Douglas' opinion that
"Whether a jury trial is in conflict with the juvenile court's underlying philosophy is irrelevant, for the Constitution is the Supreme Law of the land.
"* * * The balancing of the rehabilitative purpose of the juvenile proceeding with the due process requirement of a jury trial is a matter for a future Constitutional Convention." DeBacker v. Brainard, 396 U.S. 28, 38, 90 S.Ct. 163, 169, 24 L.Ed.2d 148, 156-7 (1969) (Douglas, J., dissenting).
Moreover, many of the significant protections to which a juvenile is entitled in the adjudicative process, such as the privilege against self-incrimination, are based on the assumption that preliminary rulings on admissibility will be made by the trial judge and that the trier of fact will consider or be influenced by the evidence only if it has been ruled admissible. A jury trial can best effectuate the contemplated insulation of the trier of fact from evidence which has been ruled inadmissible.[17]
The State and the majority opinion rely heavily on McKeiver v. Pennsylvania,[18] in which the Supreme Court held that trial by jury in the juvenile court's adjudicative stage is not required by the Sixth or Fourteenth Amendments. However, as the plurality opinion of the Supreme Court makes clear, the states are not obliged to deny *606 jury trials in juvenile cases.[19] Justice Blackmun observed,
"If, in its wisdom, any State feels the jury trial is desirable in all cases, or in certain kinds, there appears to be no impediment to its installing a system embracing that feature." 403 U.S. 528, 547, 91 S.Ct. 1976, 1987, 29 L.Ed.2d 647, 662 (1971).
Not only is Louisiana free to provide a higher standard by affording the safeguards of a jury trial to juveniles, there are other reasons why McKeiver is less than persuasive in this proceeding. The plurality opinion of the Court reflected primarily a concern over the possible adverse influence of jury trials upon "the juvenile court's assumed ability to function in a unique manner,"[20] in the states to be affected by its decision. For the reasons stated above, and primarily because our legislature wisely has separated the adjudicative and dispositional phases of juvenile court proceedings,[21] Louisiana is not threatened with the consequences which caused the high court's foreboding.[22] Furthermore, McKeiver has been justifiably criticized because of the Court's failure to explain why Duncan's eloquent reasons for holding "that trial by jury in criminal cases is fundamental to the American scheme of justice,"[23] do not compel a belief that trial by jury is also basic to the American scheme of justice for juveniles.[24] Finally, in deciding the instant case we need not consider the broad question treated in McKeiver, viz., whether the due process clause of the Fourteenth Amendment affords the right to trial by jury in all states' juvenile delinquency hearings. It is sufficient for our purposes to decide only the narrower issue of whether the statutory denial of jury trials to juvenile accuseds, existing side by side with adults' rights to a jury trial when charged with the same offenses, violates our state constitution's explicit prohibition against age-based discrimination.
Accordingly, I would hold that La.R.S. 13:1579 is unconstitutional insofar as it denies a jury trial to a juvenile, who, if he were an adult and charged with the same offense, could elect to be tried by jury. In my opinion that portion of the law is invalid as an arbitrary and unreasonable discrimination on the basis of age in contravention of Article 1, § 3 of the 1974 Louisiana Constitution. I would recognize that a juvenile charged with an offense which is triable by a jury in an adult prosecution has the right to demand a jury trial in adjudicatory proceedings. Equal protection of the laws requires that, upon his request, a juvenile is entitled to receive the same mode of jury trial which is available to an adult charged with the same offense.[25] Undoubtedly, the legislature has authority to provide a different mode of jury trial in adjudicatory proceedings so long as it complies *607 with the equal protection, due process and other constitutional safeguards.[26] Until a special juvenile jury procedure is enacted, however, an adjudicatory proceeding in which a juvenile is entitled to a jury should be governed by the criminal statute upon which the proceeding is based and the law pertaining to the jury trial rights of an adult accused of the same violation.
Although I concur in the majority holding that the right to a public trial should be available to a juvenile charged with a crime on the basis of due process, I also think this result is required on the basis of equal protection. For the same reasons that the right to a jury trial in court proceedings allegedly based on serious criminal conduct cannot be extended to adults but denied to children because of age, I am of the opinion that a juvenile accused of committing a criminal offense may not be denied the right to demand a public trial.
NOTES
[1] At this point several residents in the neighborhood were considered by the police as "potential suspects."
[2] In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[3] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Id.; see, State v. Ned, 326 So.2d 477 (La. 1976).
[5] 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966).
[6] 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).
[7] 429 U.S. 492, 500, 97 S.Ct. 711, 716, 50 L.Ed.2d 714, 722 (1977).
[8] State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, September 1-7, 1973, Vol. XIII, pp. 68-112, Vol. XIV, pp. 1-51; Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 40-48 (1974). See, State v. Welch, 337 So.2d 1114 (La. 1976).
[9] Id. See, State v. Segers, 355 So.2d 238 (La. 1978).
[10] Miranda v. Arizona, supra; State v. Welch, supra; State v. Ross, 343 So.2d 722 (La.1977).
[11] Cf. State v. Hall, 350 So.2d 141 (La.1977); State v. Ross, 343 So.2d 722 (La.1977); State v. Sylvester, 298 So.2d 807 (La. 1974). Although the issue was undoubtedly presented in these cases the opinions of the Court did not address it directly.
[12] State v. Melanson, 259 So.2d 609 (La.App. 4th Cir. 1972). See, however, the vigorous divergent view expressed in State v. Ross, 343 So.2d 722 (La.1977) (Tate, J., concurring) and State in the Interest of Holifield, 319 So.2d 471 (La.App. 4th Cir. 1975) (Fedoroff, J., concurring).
[13] 399 F.2d 467 (5th Cir. 1968) cert. den. 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969).
[14] Miranda v. Arizona, 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694, 721 (1966).
[15] State in the Interest of Holifield, 319 So.2d 471 (La.App. 4th Cir. 1975) (Fedoroff, J., concurring).
[16] See, Miranda v. Arizona, 384 U.S. 436, 468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694, 720 (1966).
[17] Id. 384 U.S. 436, 470, 86 S.Ct. 1602, 1626, 16 L.Ed.2d 694, 721 (1966).
[18] See, Comment, Louisiana's Youth Law: Rules and Practice, 35 La.L.Rev. 851, 856 (1975):

"The practice of many of the Louisiana police departments interviewed was to advise a youth who was suspected of committing a serious offense that he could remain silent and that he could consult with and have counsel present during interrogation. Police often delay interrogation until the parents of the youth are present and orally consent to the questioning. Some departments go even further and obtain a written waiver from the juvenile and his parents before seeking an admission. A few authorities interviewed, however, were lax in consistently enforcing such procedures. Failure to employ these and other safeguards may not only deny fundamental due process, but may also weaken the state's case against a delinquent youth by threatening the validity of the confession thereby obtained."
See also, Tentative Draft, ABA Standards Relating to Police Handling of Juvenile Problems, § 3.2 and comments (1977).
[19] E. g., State v. Gullings, 244 Or. 173, 416 P.2d 311, 315 (1966); See, S. Davis, Right of Juveniles: The Juvenile System, §§ 3.11 et seq. (1974); IJA-ABA Juvenile Justice Standards Project, Standards Relating to Police Handling of Juvenile Problems (1977), § 3.2, p. 70.
[20] See, e. g., Commonwealth v. Jamison, 474 Pa. 541, 379 A.2d 87 (1977); Commonwealth v. Smith, 472 Pa. 492, 372 A.2d 797 (1977); Commonwealth v. McCutchen, 463 Pa. 90, 343 A.2d 669 (1975); Lewis v. State, 259 Ind. 431, 288 N.E.2d 138 (1972); Freeman v. Wilcox, 119 Ga.App. 325, 167 S.E.2d 163 (1969).

See, Comment, Interrogation of Juveniles: The Right to a Parent's Presence, 22 Dick.L. Rev. 543 (1972-73); Comment, Recent Developments-Criminal Law, 1972 Univ. of Ill.L. Forum 625; Note, 34 U. of Pitt.L.Rev. 321 (1972); Note, 3 Seton Hall L.Rev. 482 (1972); Note, 23 Baylor L.Rev. 467 (1971); Note, 68 Col.L.Rev. 1149 (1968).
In § 3.2 of the IJA-ABA Juvenile Justice Standards Project, Standards Relating to Police Handling of Juvenile Problems (1977), it is stated:
"* * * For some investigative procedures, greater constitutional safeguards are needed because of the vulnerability of juveniles. Juveniles should not be permitted to waive constitutional rights on their own. * * *"
See, also, the Commentary commencing on p. 69.
Rule 25 of the Model Rules for Juvenile Courts prepared by the Council of Judges of the National Council on Crime and Delinquency (1969) recommends, in part:
"No extrajudicial statement by the child to a peace officer or court officer shall be admitted into evidence unless it was made in the presence of the child's parent or guardian or counsel. No such statement shall be admitted into evidence unless the person offering the statement demonstrates to the satisfaction of the court that, before making the statement, the child and his parents were informed and intelligently comprehended that he need not make a statement, that any statement made might be used in a court proceeding, and that he had a right to consult with counsel before or during the making of a statement."
[21] See, e.g, Commonwealth v. Jamison, 474 Pa. 541, 379 A.2d 87 (1977); Commonwealth v. Smith, 472 Pa. 492, 372 A.2d 797 (1977); Commonwealth v. McCutchen, 463 Pa. 90, 343 A.2d 669 (1975); Lewis v. State, 259 Ind. 431, 288 N.E.2d 138 (1972); Freeman v. Wilcox, 119 Ga.App. 325, 167 S.E.2d 163 (1969).
[22] See, e. g., Commonwealth v. Smith, 472 Pa. 492, 372 A.2d 797 (1977).
[23] A. Ferguson and A. Douglas, A Study of Juvenile Waiver, 7 San Diego L.Rev. 39 (1970).
[24] See, e. g., La.C.C. art. 1785; La.C.C.P. art. 4501.
[25] IJA-ABA Juvenile Justice Standards Project, Standards Relating to Police Handling of Juvenile Problems, § 3.2 at p. 70; Ferster and Countless, The Beginning of Juvenile Justice, Police Practices and the Juvenile Offender, 22 Vand.L.Rev. 567, 569-97 (1969); see the concurring opinion of Fedoroff, J., State in the Interest of Holifield, supra: " * * * I cannot fathom how a minor, who lacks [see La.C.C. art. 1785 and La.C.C.P. art. 4501] the capacity to sell, mortgage, donate or release (who could not even contract with the lawyer whose services he waives) can be said to possess the capacity to waive constitutional privileges and lose his freedom as a consequence." 319 So.2d at 475.
[26] La.Const.1974, Art. I, §§ 2 (Due Process of Law), 3 (Right to Individual Dignity [equality], 13 (Rights of the Accused), 16 (Right to a Fair Trial [right against self-incrimination]).
[27] See, Commonwealth v. Smith, 472 Pa. 492, 372 A.2d 797, 803 (1977). (Mandarino, J., concurring).
[28] La.R.S. 13:1569(3) defines "child" as a person less than seventeen years of age. However, La.R.S. 13:1570, subd. A(5) excepts from juvenile court jurisdiction any child fifteen years old or over who is charged with a capital offense or attempted aggravated rape.
[29] La.R.S. 13:1580(A)(2).
[30] La.R.S. 13:1580(A)(2)(a). However, a child under the age of thirteen years may not be committed unless he committed a felony. La. R.S. 13:1580(A)(2).
[31] La.R.S. 13:1579(B); La.R.S. 13:1570(A)(5) provides that the juvenile courts do not have jurisdiction over a child fifteen years or older, who is charged with committing a capital crime or attempted aggravated rape. Cf. La.Const. 1974, Art. 5, § 19.
[32] Louisiana Department of Corrections Annual Statistical Report, fiscal year 1976-77.
[33] La.R.S. 13:1580(A)(2)(a).
[34] La.R.S. 13:1580(A)(2).
[35] La.R.S. 13:1580(A)(2)(a).
[36] La.R.S. 15:907(B). In the instant case we are not called upon to express our opinion as to the validity of the transfer procedures set forth in La.R.S. 15:907.
[37] Id.
[38] La.R.S. 15:907.
[39] E. g., the maximum period of incarceration following conviction in cases involving the selected offenses are:

Negligent homicide not more than five years (La.R.S. 14:32); simple arson where the damage is less than $500 a $2500 fine or imprisonment for not more than five years or both (La.R.S. 14:52, as amended by Act 53 of 1977); simple robbery not more than seven years with or without hard labor (La.R.S. 14:65, as amended by Act 134 of 1977); theft involving a value of greater than $100 but less than $500 not more than two years with or without hard labor (La.R.S. 14:67); improper telephone communications not more than two years or a $500 fine or both (La.R.S. 14:285).
[40] See La.R.S. 15:906.
[41] See footnote 36, supra.
[42] In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[43] 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).
[44] 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).
[45] 381 U.S. 532, 538-9, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543, 548 (1965).
[46] United States Constitution, Sixth Amendment; La.Const. 1974, Art. 1, § 16; McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (Brennan, J., concurring).
[47] See also, R.L.R. v. State, 487 P.2d 27 (Alaska, 1971); IJA-ABA Juvenile Justice Standards Project, Standards Relating to Adjudication (1977), § 6.1 et seq. and comments. For the same reasons expressed in his separate dissenting opinion, the author is of the opinion that denial of a public trial to a juvenile charged with the commission of a criminal offense is also invalid as a contravention of the ban against arbitrary and unreasonable age-based discrimination. La.Const. 1974, Art. 1, § 3.
[48] For the reasons stated in a separate dissenting opinion, the author and two other members of this Court disagree with the reasons and holding expressed in the part of this Court's opinion pertaining to jury trial.
[49] We have reviewed relator's other assignments of error relating to witness sequestration; priest-penitent privilege; introduction of hypnosis evidence; and motion to clarify procedure and find them to be without reversible merit.
[1] Article 1, § 3 of the Louisiana Constitution of 1974 provides:

"No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."
[2] XII, Constitutional Convention of 1973, Verbatim Transcripts, August 29, 1973, pp. 57-77, 80-99, August 30, 1973, pp. 2-6; Hargrave, Declaration of Rights of the 1974 Louisiana Constitution, 35 La.L.Rev. 1, 7 (1974).
[3] La.Const.1974, Art. 1, § 17; Art. 5, § 19; La.R.S. 13:1570(A)(5).
[4] La.R.S. 13:1579.
[5] La.Const.1974, Art. 1, § 17.
[6] See footnote 4, supra.
[7] La.Const.1974, Art. 1. § 17.
[8] Juvenile Exits by Major Crime Categories and Length of Stay

 No. Exits Average No. Exits Average
 1975-76 Stay 1976-77 Stay
Robbery and
Extortion 60 353 days 89 371 days
Assault and
Battery 59 271 67 223
Burglary
and Theft 414 266 525 254
Drugs 47 229 24 254
Other 297 275 277 296

Louisiana Department of Corrections Annual Statistical Report, fiscal year 1975-76, 1976-77.
[9] 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).
[10] In Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) the Supreme Court held the right to a trial by jury guaranteed under Duncan v. Louisiana, supra, extended to a criminal contempt proceeding which had been previously thought to be a non-serious offense and which, at common law, had been tried without a jury. The Court found such proceedings to be "indistinguishable" from ordinary criminal proceedings since the impact on the individual was the same in terms of deprivation of freedom. Even though such proceedings had traditionally been disposed of summarily before a judge for purposes of judicial efficiency, the Court ruled that these considerations must give way to the right to trial by jury.
[11] La.R.S. 13:1561 et seq. Cf. Note, 38 Brooklyn L.Rev. 650, 657 (1972).
[12] La.R.S. 13:1569 provides, in pertinent part:

"Adjudicatory hearing' means a hearing to determine whether the allegations of a petition under this chapter are supported by the standard of proof applicable to that case or class of case.
"`Dispositional hearing' means a hearing to determine what order of disposition should be made concerning a child adjudicated as delinquent, uncontrollable or ungovernable, in need of supervision, neglected or dependent, as defined in this section. Such hearing may be part of the proceeding which includes the adjudicatory hearing, or it may be held at a time subsequent to the adjudicatory hearing."
[13] In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Court held the burden of proof beyond a reasonable doubt standard applicable to juvenile proceedings.

In Louisiana the adversary features of the right to counsel, the privilege against self-incrimination and the standard of proof beyond a reasonable doubt have been implemented legislatively. La.R.S. 13:1579 and 1579.1.
[14] See, Note, 47 Notre Dame Lawyer 655 (1972); 11 Journal of Family Law 107 (1971); Note, 22 Syracuse L.Rev. 780 (1971); Note, 32 La.L.Rev. 133 (1971).
[15] IJA-ABA Juvenile Justice Standards Project, Standards Relating to Adjudication (1977), Part IV: Contested Adjudication Proceedings, pp. 51 et seq.
[16] See, R.L.R. v. State, 487 P.2d 27, 30 (Alaska, 1971).
[17] IJA-ABA Juvenile Justice Standards Project, Standards Relating to Adjudication (1977), Part IV: Contested Adjudication Proceedings, pp. 51 et seq.
[18] 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).
[19] A number of states statutorily provide for a jury trial in juvenile adjudicatory hearings. See, Col.Rev.Stat.Ann. § 19-1-106(4); Mont. Rev.Codes Ann. § 10-1220(1); Okla.Stat.Ann. tit. 10, § 1110; S.Dak. Compiled Laws Ann. § 26-8-31; Tex.Fam.Code Ann. § 54.03; W.Va. Code Ann. § 49-5-6; Wis.Stat.Ann. § 48.25(2); Wyo.Stat.Ann. § 14-115.24(c). In other states courts have held that a juvenile has a right to a jury trial. See, e.g., R.L.R. v. State, 487 P.2d 27 (Alaska 1971); Commonwealth v. Thomas, 359 Mass. 386, 269 N.E.2d 277 (1971); Peyton v. Nord, 78 N.M. 717, 437 P.2d 716 (1968).
[20] 403 U.S. 528-547, 91 S.Ct. 1976, 1987, 29 L.Ed.2d 647 (1971).
[21] See footnote 12, supra.
[22] The juveniles in the North Carolina case consolidated with McKeiver presented these reasons as an argument. See, 403 U.S. at 542, 91 S.Ct. 1976. However, the Court did not address the argument or explain how a jury trial confined to a separate adjudicative proceeding would terminate the "idealistic prospect of an intimate, informal protective" dispositional proceeding. Id. 545, 91 S.Ct. 1986.
[23] 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491, 496 (1968).
[24] E.g., Comment, 56 Minn.L.Rev. 249 (1971); Note, 49 N.Dak.L.Rev. 625 (1972-73); Note, 38 Brooklyn L.Rev. 650 (1972); Note, 47 Notre Dame Lawyer 655 (1972); Note, 39 Tenn.L. Rev. 508 (1972); Note, 50 N.Car.L.Rev. 128 (1971); Note, 24 Vand.L.Rev. 1281 (1971); Note, 70 Mich.L.Rev. 171 (1971); Note, 32 La. L.Rev. 133 (1971).
[25] See, La.Const.1974, Art. 1, § 19; La.C.Cr.P. art. 782.
[26] See, La.Const. 1974, Art. 5, § 19. We note that several states provide for six person juries in juvenile adjudicatory hearings. See, e.g., Col.Rev.Stat.Ann. § 19-1-106(4); Okla.Stat. Ann. tit. 10, § 1110; S.Dak. Compiled Laws Ann. § 26-8-31. The ABA recommends a six person jury. IJA-ABA Juvenile Justice Standards Project, Standards Relating to Adjudication (1977) § 4.1. West Virginia provides for a twelve person jury. W.Va.Code Ann. § 49-5-6. Accordingly, there would appear to be no objection to one mode of jury trial for all adjudicatory proceedings triable by jury with the size of the jury being within a range of six to twelve members. The vote required to render a verdict, however, should either be unanimous or by a majority so substantial as to constitute a determination beyond a reasonable doubt. Cf. In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).