365 So.2d 1272 (1978)
STATE of Louisiana
v.
Donnie Franklin COLLUM.
Nos. 62157, 62158, 62159 and 62160.
Supreme Court of Louisiana.
November 13, 1978.
Dissenting Opinion December 22, 1978.
Dissenting Opinion February 1, 1979.
*1273 Ferdinand J. Kleppner, Grisbaum & Kleppner, Metairie, Wilson F. Walters, Wilson F. Walters & Associates, Inc., Denison, Tex., for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara B. Rutledge, Asst. Atty. Gen., Francis F. Dugas, Dist. Atty., Walter K. Naquin, Jr., Asst. Dist. Atty., for plaintiff-appellee.
*1274 SUMMERS, Justice.
Jessie Collum, his wife Lenora, and their children, Jeffrey, age nine, and Anna, age six, were killed on May 27, 1977 in their trailer home in the Four Point Heights Subdivision to the Town of Raceland, in Lafourche Parish, Louisiana. All had been shot several times; Jessie Collum had also been stabbed several times. Two days later Donnie Collum, who was then fifteen years old, having been born December 21, 1961, and his brother Scott Collum, age thirteen, were stopped by police officers in Benson, Arizona, driving a 1974 Cadillac automobile. The brothers admitted the Cadillac belonged to Jessie Collum, their father by his first marriage to Peggy Mendoza, and that they had taken it without permission. The Arizona authorities retained custody of the automobile and the boys were turned over to their mother in Victoriaville, California.
On June 1, 1977 the bodies of the four Collums were discovered. Police authorities in Lafourche Parish ascertained that Donnie and Scott had been living with their father and that the Cadillac was missing. Accordingly, a nationwide bulletin was broadcast in an attempt to locate the Cadillac for investigation in connection with a homicide. As a result of an inquiry to that office on June 3, the San Bernardino County Sheriff's office notified the Lafourche authorities of the whereabouts of Donnie and Scott Collum in Victoriaville, California. Arrest warrants were then issued by the District Judge in Lafourche Parish to arrest them for theft. Donnie and Scott were apprehended on June 3, 1977 and taken to Sheriff's Office Sub-Station in Victoriaville.
They were questioned about the car theft and the killings and gave a statement to the California authorities admitting their guilt of the killings. Later, on the evening of June 3, two Lafourche Parish deputies arrived and Donnie and Scott were again questioned and confessed for a second time.
Upon their return to Louisiana Donnie was indicted by the grand jury for four counts of first degree murder as a juvenile fifteen years of age charged with a capital offense. La.Const. art. V, § 19; La.Rev. Stat. 14:30; La.Rev.Stat. 13:1570(A)(5). A motion to suppress his confessions was filed, heard and denied on December 5, 1977. The charges were then reduced to four separate counts of second degree murder, to which Donnie pled guilty on February 24, 1978, reserving his right to appeal the ruling on the motion to suppress. On each of the four counts he received a sentence of life imprisonment without the benefit of probation or parole for forty years, such sentences to be served consecutively. La. Rev.Stat. 14:30.1.
On this appeal three assignments of error are urged.

I.
At the outset it must be determined whether this Court's decision in State in the Interest of Dino, 359 So.2d 586 (La.1978), is applicable to this prosecution. By that decision this Court decided that a confession of a person under seventeen years of age is not admissible unless the juvenile actually consulted with an attorney or an adult before waiving his right to silence; that the attorney or adult consulted was interested in the welfare of the juvenile; and if an adult other than an attorney is consulted, the adult also must be fully advised of the rights of the juvenile.
If the Dino holding applies to the case at bar, the State readily concedes the conviction must be reversed because the Dino decision was not complied with. No attorney, parent or adult friend actually consulted with the defendant at the interrogation. The State submits, however, that Dino should not be applied retroactively and the case should be governed by the "Totality of Circumstances Test", the rule of law in these cases for many years in this State and in the Federal courts.
Dino became effective June 15, 1978. The offenses in the case before us occurred on May 27, 1977, and the guilty pleas were entered on February 24, 1978. A motion to appeal was filed on March 3, 1978 returnable on May 2, 1978, and filed in this Court on May 3, 1978. Thus the issue of the retroactivity of the Dino decision, or at *1275 least its applicability to cases on direct appeal at the time of the decision, is squarely presented.
The Dino case dealt in part with a confession obtained from a thirteen-year-old boy as the result of a custodial interrogation. This Court concluded that the State had failed to show beyond a reasonable doubt under the totality of circumstances test that the juvenile had knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. This Court felt, however, that the "exclusive use of the totality of circumstances test in relation to waivers by juveniles tends to mire the courts in a morass of speculation." To end this speculation on the part of both the courts and the police, it was decided that to demonstrate a knowing and intelligent waiver on his part, the State "must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian, or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination." This Court recognized that though most minors are not mature enough to understand their rights nor competent to exercise them, some minors would be capable; nevertheless, it made the consultation an absolute prerequisite to waiver because such a requirement was a step toward guaranteeing knowing and intelligent waivers regardless of the minor's degree of sophistication. 359 So.2d at 591-94.
In its impact on the law and police custodial interrogation, this decision may be likened to the United States Supreme Court decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in which the Court made the giving of certain warnings or rights an absolute prerequisite to the admissibility of an in-custody confession. As in this case, it was not long before the courts were called upon to determine the retroactivity of what has become known as the Miranda Rule.
In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the United States Supreme Court decided that the Miranda Rule would apply only to cases in which the trials commenced after the decision was handed down. Three criteria were formulated for deciding the retroactivity issue: 1) the purpose of the new rule; 2) the reliance which may have been placed upon prior decisions on the subject; and 3) the effect on the administration of justice of a retroactive application.
This Court's decision in State v. King, 347 So.2d 1108 (La.1977), took the position that the balancing process of the criteria applied in Johnson v. New Jersey would be explored only where a newly announced rule does not go to the very integrity of the fact-finding process. Where the integrity of the fact-finding process is impaired, retroactivity would be imposed.
While the integrity of the fact-finding process is inextricably entwined with the three criteria applied in Johnson v. New Jersey, a separate and threshold consideration of that factor is articulated in keeping with the mandate of State v. King.
Under the law as it existed when Donnie Collum gave the confessions, it was not sacramental to the validity of a juvenile's confession that the State "must affirmatively show that the juvenile engaged in a meaningful consultation with an attorney or informed parent, guardian or other adult interested in his welfare before he waived his right to counsel and privilege against self-incrimination" as mandated by this Court's decision in Dino. Aside from his claim that the Dino decision should be applied retroactively to his case to invalidate his confession, defendant makes insubstantial claims that his confession was involuntary. As this opinion points out hereafter no procedures were employed in taking the statements which were not permissible under the then prevalent jurisprudence approving the totality of circumstances test.
The major design of the new rule announced in Dino, even if it were to overcome an aspect of the criminal trial that substantially impairs its truth-finding function, is not violated in this case where there was no trial and the accused has pled guilty. In such a situation, this Court's jurisprudence and the jurisprudence of the Federal *1276 courts have consistently held that only the jurisdiction of the court which received the plea is reviewable on appeal. Lefkowitz v. Newsome, 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); State v. Torres, 281 So.2d 451 (La. 1973); State v. Foster, 263 La. 956, 269 So.2d 827 (1972). The rule is, however, subject to an exception applicable to this case. With the court's approval defendant reserved the right to appellate review of the non-jurisdictional ruling on the motion to suppress. Review of that ruling is therefore permissible under this exception. State v. Crosby, 338 So.2d 584 (La.1976).
But the Dino rule does not go to the very integrity of the fact-finding process. The decision purports to assure that a juvenile answering questions at a custodial interrogation does so with an intelligent understanding of his right to remain silent and of the consequences which may flow from relinquishing that right. This is the same purpose that the older voluntariness standard and the prophylactic Miranda rule served. Consequently, although an additional safeguard was announced in Dino, an accused whose case was being tried or on appeal on the effective date of Dino was nevertheless not deprived of asserting the same claim of involuntariness under the totality of circumstances test.
In the case at bar no evidence has been excluded and no question of the voluntariness or accuracy of the guilty plea is urged. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971). Only the validity of defendant's confession is argued. The very integrity of the fact-finding process is unaffected.
Complete retroactive effect was not given to the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Likewise in Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), the Court declined to give retroactive effect to Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). See also, our opinion in City of Baton Rouge v. Short, 345 So.2d 37 (La.1977).
Having decided that the Dino rule does not impair the integrity of the fact-finding process under the circumstances of this case, an analysis of the three criteria announced in Johnson v. New Jersey, supra, is appropriate.
The purpose of the new rule enunciated in Dino is twofold: to protect the juvenile's right against self-incrimination and his right to counsel. It is not argued that the risks of convicting an innocent person are increased when the right against self-incrimination is unknowingly waived. An increased danger comes only when the incriminating statement given is likely to be false, a circumstance resulting not from a mere waiver of the right, but from additional outside pressures. The absence of counsel at this pretrial stage does not increase the risk of convicting an innocent either. The most counsel could do at this stage (for the person being questioned) is either bargain for a plea or advise his client not to answer any questions; both functions are undoubtedly of more use to a guilty person than to an innocent one. In sum, the Dino rules are not meant to avoid a risk of convicting an innocent person, and the absence of the Dino procedure does not affect the integrity of the fact-finding process.
Reliance which may have been placed upon prior decisions on the subject was the second criteria examined in Johnson. Prior to the Dino decision the "totality of circumstances" test was well accepted in Louisiana as a basis for deciding whether a juvenile had knowingly and intelligently waived his right. State v. Hills, 354 So.2d 186 (La. 1977); State v. Hall, 350 So.2d 141 (La. 1977); State v. Ross, 343 So.2d 722 (La. 1977); State v. Ghoram, 328 So.2d 91 (La. 1926); State v. Sylvester, 298 So.2d 807 (La.1974); State v. Melanson, 259 So.2d 609 (La.App.1972).
The prevailing rule throughout the nation at the time was to the same effect. West v. United States, 399 F.2d 467 (5th Cir. 1968); Mosley v. State, 246 Ark. 358, 438 S.W.2d 311 (1969); People v. Lara, 67 Cal.2d 365, 62 *1277 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. denied, 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407; State v. Roberts, 274 So.2d 262 (Fla. App.1973); American Law Institute, Model Code of PreArraignment Procedure, pp. 361-62 (1975).
From these authorities it is abundantly clear that neither the courts nor law enforcement authorities in Louisiana were aware that a juvenile's custodial interrogation could not under any circumstance be conducted without consultation with attorney, parent or adult as set forth in Dino. Reliance on prior decisions on the subject was therefore explicit.
Considering the purpose of the rule announced in Dino and the undoubted firm and justifiable reliance upon the "totality of circumstances test" repeatedly approved by the courts of Louisiana and elsewhere, an extremely detrimental effect upon the administration of justice would result from a retroactive application of the Dino rule requiring the release of all persons convicted on the basis of custodial interrogations under the totality of circumstances test.
For these reasons Dino will affect only those cases in which the trial began after June 15, 1978.

II.
By this argument defendant urges that the trial court should have suppressed the confession because at the time of the confession defendant was being detained in a lock-up in California intended primarily for adult offenders, allegedly in violation of statutes proscribing such conduct in Louisiana and California.[1] When defendant was *1278 arrested in Victoriaville, he was brought to a police substation and questioned. After the interview, he was placed in a cell and left there for about four hours until he had a second interview, at which he confessed. The cell in which he was placed was part of a separate-block with a locking door, built so that the police could segregate juveniles from adult prisoners. Other than a trusty who delivered his food and cleaned an adjoining cell, defendant did not say that he saw any prisoners.
Although Louisiana's statute stipulates that minors shall not be confined in either a police station or jail, it allows children fifteen years of age or older to be detained in a place of detention for adults, as long as they are in a room or ward separate from the adults. This was the situation in this case and the brief encounter with the trusty can hardly be considered a confinement "in association with criminal, vicious or dissolute persons" which the statute condemns. In any event the statute does not purport to invalidate a confession when its proscriptions are not observed, only to punish the peace officer who placed the juvenile there. Improper confinement is only one factor in the totality of circumstances test. State in the Interest of Wesley, 285 So.2d 308 (La.App. 1973).
Minors who commit a crime in another state and flee to California are given less protection. They, other than for housing purposes, may be proceeded against as adults but must be detained in a juvenile hall if space is available, otherwise they may be confined in the county jail. Standard procedure in that state is to complete the initial investigation before transferring a minor to a juvenile hall.

III.
Proper application of the totality of circumstances test requires that the State sustain the burden of affirmatively proving that the waiver of rights was made freely and voluntarily, with understanding of the consequences which might flow from such a waiver. La.Rev.Stat. 15:451; State v. Hills, 354 So.2d 186 (La.1977). Age of the defendant is a factor which requires this Court to give closer scrutiny to the confession of a juvenile than would ordinarily be required of an adult confession. State v. Sylvester, 298 So.2d 807 (La.1974).
There is no claim here that the defendant was beaten or coerced, promised anything as an incentive, or induced to confess on these grounds. His contention is simply that he did not understand either his Miranda rights or the consequences of waiving them, so his attempted waiver is therefore invalid even under the pre-Dino totality test.
There is no litany of factors to be considered in applying the test. Each case is to be judged on all of the facts and circumstances in that particular situation. Obviously they will vary. At the suppression hearing these facts were adduced: Defendant is a fifteen-year-old minor, who completed 9th grade, and while average in math, was poor in reading. He and his brother were arrested at the residence of their sister where they were staying at 2:30 on the afternoon of June 3. In their mother's presence they were informed that they were being arrested in connection with the theft of an automobile. Their mother was told that if she wanted further information, she would have to go to the police station. No mention was made at this time that the investigation involved murder. The boys *1279 were handcuffed and taken to the police station. On the way, they were read their Miranda rights from a standard police card. Both acknowledged that they understood their rights.
At the station defendant was "reminded" (but not read) of his rights, and asked if he understood them. When he responded affirmatively, the officers began questioning him about the car theft. After about thirty minutes, they told him that his father had been shot, and asked if he could tell them anything about it. When defendant became nervous, the questioning was discontinued. At no time did he demand to see either an attorney or his mother, the officers testified. Defendant's testimony at the suppression hearing was to the contrary. He said that when the police began questioning him about the murder, he asked to see an attorney. When he did, the policeman said "Okay, but let me ask you a couple more questions," according to defendant's testimony, and they asked him about his name, age and other purely informational questions. It is uncontroverted that at no time thereafter did defendant ask to see his mother or an attorney. He said he did not because he understood the policeman's response, "Okay," meant they would obtain counsel for him. No further explanation of the Miranda rights was given or requested. The police were convinced that defendant thoroughly understood his rights.
Following this interview defendant was removed for booking and placed in a cell. While there the police interrogated his brother, who confessed and implicated defendant. Defendant testified that while he was in a cell, he talked to a man whom he supposed was a jailer (but was actually a trusty). The man told him that if he confessed, he would get three years at most. This testimony was not corroborated.
Defendant then sent for one of the detectives and asked if he could find out what his brother had said. He was told something to the effect that his brother had told everything, and about thirty seconds of the taped interview with his brother was played. He was again reminded of his rights and indicated that he understood them. Then, some six hours after being taken into custody, but after only forty minutes of interrogation, defendant made an inculpatory statement which was tape recorded. A short while later, about 10 p. m., his mother was allowed to see him. Some ten hours after his arrest, Louisiana officers arrived in California. Basing their questions on defendant's prior statements, these officers questioned defendant after advising him of his rights. This confession was also recorded on tape.
These tape recordings were heard by the trial judge and in this Court. They show a careful, slow and deliberate interview, free of any hint of impropriety by the officers and expressing an unrestricted willingness on the part of defendant to disclose even the most minute details of the offenses. The recordings are the essence of voluntariness.
All of the circumstances support a finding of a free and voluntary confession. Defendant was no stranger to police procedure or contact with law enforcement authorities, having had several encounters with the law relating to juvenile delinquency. Within six weeks of these murders he had been in police custody on at least two occasions. He was arrested in his mother's presence and given the Miranda warnings immediately thereafter. Four times thereafter he was reminded of these rights and acknowledged that he understood them.
The first interrogation lasted approximately 30 minutes, the second about 40 minutes. After his incarceration and prior to the first confession defendant was detained in a cell alone and was served a meal and permitted to rest.
In a ruling on the voluntariness of a confession the decision of the trial judge is assigned great weight. State v. Ross, 343 So.2d 722 (La.1977); State v. Payne, 338 So.2d 682 (La.1976). In a careful and thorough per curiam the trial judge who presided at the suppression hearing reviewed the evidence and the law pertaining to the evidence he heard. Many of the crucial questions involved credibility determinations which he resolved in favor of a finding that *1280 the confessions were free and voluntary. Our review of the evidence resolves the matter in favor of affirming that ruling.
For the reasons assigned, the convictions and sentences are affirmed.
TATE, J., dissents and assigns reasons.
DIXON, J., dissents.
DENNIS, J., dissents and assigns reasons.
TATE, Justice, dissenting.
I dissent for substantially the reasons that will be assigned by my brother DENNIS.
The rule announced in State in the Interest of Dino, 359 So.2d 586 (La.1978) was designed to insure integrity of the fact-finding process.
The decision recognized the questionable voluntariness and truthfulness of the confession of a juvenile, who responds to interrogation under police custody without consultation with an attorney or adult member of his family. The rule recognized the general unreliability of confessions of young persons (here, a 15-year-old boy), responding to interrogation while surrounded by adult police officers and secluded in police custody from the advice and counsel of adults who care.
Even adults, with more mature judgment and experience of the world, have been known to respond falsely in order to please their captors or to avoid the unknown but imagined terrors of a refusal to do sowitness Miranda and its prophylactic rule, designed to end the substantial danger in the administration of criminal justice of the use of false or coerced confessions in lieu of objective investigation in order to assure convictions.
In the present instance, the interrogation tactics appear to have been gentle and professional. There may be good reason to believe that, in this case, the confession of the defendant boy is not untruthful.
Yet Dino recognizes that children should not be sent to adult prisons for the rest of their lives on the basis of uncounselled confessions, inherently unreliable.
The reasons behind Dino demand, whether the confessions have been obtained before or after that decision, that it be applied to all confessions obtained from juveniles where they have not been permitted first to confer with adults of their family or a lawyer. That decision merely enunciated a protection for the integrity of the truth-finding process in prosecutions of juveniles of such obvious necessity that, even before Dino, many if not most enlightened law-enforcement agencies had already adopted the practice formally mandated by that opinion.
I therefore respectfully dissent.
DENNIS, Justice, dissenting.
State in the Interest of Dino, 359 So.2d 586 (La.1978) set forth this Court's view of what the prosecution must prove in order to show that a juvenile knowingly and intelligently waived his constitutional right to counsel and his privilege against self-incrimination before giving a confession. The prosecution bears a heavy burden of proving, not only that the waiver was made knowingly, intelligently and voluntarily, but also that the juvenile engaged in a meaningful consultation with an attorney or an informed parent, guardian or other adult interested in his welfare before waiving his rights. The majority opinion acknowledges this much of the Dino holding.
However, the majority opinion concludes that Dino`s standards of official conduct in the interrogation of juveniles have nothing to do with the integrity of the fact-finding process. In my opinion the majority has overlooked some of the important underlying reasons for the Dino decision and the realities from which they are derived.
In Dino we plainly stated three reasons why juveniles should not be allowed to waive their constitutional rights on their own. In addition to the main reasonto assure that the waiver itself is knowing, intelligent and voluntarywe set forth two other reasons which relate to the voluntariness of the juvenile's confession, as well as to his waiver of rights. We said that "[i]f the juvenile decides to talk to his interrogators, the assistance of an adult can mitigate *1281 the dangers of untrustworthiness" and "the likelihood that the police will practice coercion;" and that "[t]he presence of such an adult can also help to guarantee that the accused gives a fully accurate statement and that the statement is rightly reported by the prosecution at trial." 359 So.2d at 592.
It is evident, therefore, that the Dino rule does go to the integrity of the fact-finding process. When a confession is admitted into evidence it has such a persuasive effect upon the trier of fact as to substantially determine the outcome of the fact-finding process. Consequently, the determination of guilt or innocence is usually predetermined at the time the confession is obtained. See, State v. Glover, 343 So.2d 118, 129 (La.1977); Comment, The Coerced Confession Cases in Search of a Rationale, 31 U.Chi.L.Rev. 313, 325 (1964). Obviously, then, the Dino rule, which seeks to insure trustworthiness, voluntariness and accurate reporting of juvenile confessions, is vitally concerned with the ultimate fact of guilt or innocence and the process by which it is determined.
Under our established principles of interpretation a new constitutional doctrine must be given complete retroactive effect when its major purpose is to overcome an aspect of the judicial proceeding which impairs its truth finding function and so raises serious questions about the accuracy of determinations of guilt in past trials. State v. Swift, 363 So.2d 499 (La.1978); State v. King, 347 So.2d 1108 (La.1977); City of Baton Rouge v. Short, 345 So.2d 37 (La. 1977); cf. Ivan v. City of New York, 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972); Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).
Since the major function to be served by Dino is the prevention of unfair determinations of guilt based on improvident or untrustworthy juvenile confessions, it is clear that Dino should be given complete retroactive effect.
Moreover, other factors which weigh against retroactive effect of a new constitutional doctrine do not apply to Dino. The extent of reliance on the old rule by Louisiana law enforcement officials was not significant and Dino's impact on the administration of justice will not be severe. See, Williams v. United States, supra. The decision in Dino merely required by law a procedure already followed in practice by many Louisiana police officers. See, State in the Interest of Dino, 359 So.2d 586, 592-93 (La. 1978); Comment, Louisiana's Youth Law: Rules and Practice, 35 La.L.Rev. 851, 856 (1975). The practice now required by Dino was foreshadowed in numerous state and federal decisions. In State v. Ross, 343 So.2d 722, 729 (La.1977), members of this Court noted that, in proceedings against juveniles, most investigating officers took the precaution of allowing a juvenile to confer with a family member before a waiver of his rights, and commended the procedure. As early as 1948, the United States Supreme Court recognized that a juvenile's isolation from any friendly adult prior to police interrogation raised serious questions concerning voluntariness. See, Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948). See also, Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962).
For all of these reasons, but primarily because uncounselled guilty pleas by children substantially impair the truth finding functions of juvenile and adult courts, I respectfully dissent from the majority's refusal to give complete retroactive effect to the constitutional rule announced in Dino.
NOTES
[1] La.Rev.Stat. 13:1577:

"A. Whenever a child is taken into custody, unless it is impracticable or inadvisable or has been otherwise ordered by the court, he shall be released to the care of a parent, tutor or other custodian, upon the promise of such parent, tutor or custodian to bring the child to the court at the time fixed. The court may require a bond from such person for the appearance of the child; and upon the failure of such person to produce the child when directed to do so, the court may, in addition to declaring the bond forfeited, punish that person as in case of contempt. If not so released such child shall be taken immediately to the court or to the place of detention designated by the court or probation officer. Any police officer, sheriff, probation officer, or other peace officer violating any of the terms of this section may be judged guilty of contributing to the act or condition which would bring a child within the provision of this chapter. Pending further disposition of the case, the child may be released to the care of a parent, tutor, agency or other person appointed by the court, or be detained in such place as shall be designated by the court or probation officer subject to further order.
"B. Nothing in this Chapter shall be construed as forbidding any peace officer from immediately taking into custody any child who is found violating any law or ordinance, or whose surroundings are such as to endanger his welfare. In every case the officer taking into custody any child for detention shall immediately and in any event within twenty-four hours, report the fact to the court or probation officer and the case shall then be proceeded with as provided by law. In addition, nothing in this Chapter shall be construed as forbidding any peace officer from taking into temporary custody during school hours any child who is required by law to attend school and is now exempted under the provisions of R.S. 17:226, where such child has absented himself or herself from school without proper authority, provided that the peace officer shall immediately place the child in a school facility or receiving center designated by the parish school board for acceptance of such child, or momentarily detaining any child from the age of seven through fifteen, both inclusive, who appears to be absent from school during normal school hours, and inquiring of the circumstances relative to his or her being absent from school.
"C. Except as hereinafter provided, no child shall be confined in any police station, prison or jail, or be transported or detained in association with criminal, vicious or dissolute persons. A child fifteen years of age or older may be placed in a jail or other place of detention for adults, but in a room or ward entirely separate from adults.
"D. Whenever a child under the age of seventeen years is taken into custody by a peace officer or probation officer, except when the child willfully misrepresents himself as seventeen or more years of age, such child shall be released within seventy-two hours after having been taken into custody, excluding non-judicial days, unless within said period of time a petition to declare him a delinquent or a child in need of supervision has been filed pursuant to the provisions of this chapter.
"E. Whenever a child who has been held in custody for more than twelve hours by a probation officer, or law enforcement official of the state, city, parish or municipality and subsequently released and no petition is filed, the said official shall prepare a written explanation of the reasons why the child was held in custody for more than twelve hours. The written explanation shall be prepared within seventy-two hours after the child is released from custody and filed in the record of the case. A copy of the written explanation shall be sent to the parents, tutor, guardian, or other person having care or custody of the child."
Cal.Code Ann., Welfare & Institutions § 216(b):
"(b) To any person who violates any law of another state defining a crime, and is at the time of such violation under the age of 18 years, if such person thereafter flees from that state into this state. Any such person may be proceeded against as an adult in the manner provided in Chapter 4 (commencing with Section 1547) of Title 12 of Part 2 of the Penal Code. The magistrate shall, for purposes of detention, detain such person in juvenile hall if space is available. If no space is available in juvenile hall, the magistrate may detain such person in the county jail."