479 So.2d 344 (1985)
STATE of Louisiana
v.
Frederick JOHNSON.
No. 85-KA-0579.
Supreme Court of Louisiana.
December 2, 1985.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., William E. Tilley, Dist. Atty., for plaintiff-appellee.
Daryl Gold, Leesville, for defendant-appellant.
WATSON, Justice.
Defendant was convicted of first degree murder and sentenced to life imprisonment without benefit of pardon, parole, or suspension of sentence in September, 1977.
*345 An out-of-time appeal was granted in May, 1981, and defendant's attorney was ordered to pursue the appeal in November, 1984.

ISSUE
The only issue is the admissibility of an allegedly illegal confession. Defendant urges reconsideration of the holding in State v. Collum[1] that State In The Interest of Dino[2] is not retroactive.
On the evening of February 14, 1977, Frederick Bruno Johnson, age sixteen;[3] Benny Ray Thomas, age eighteen; Robert Anthony White, age seventeen; and Jerry J. Williams, age eighteen, robbed store clerk Laura Wilson of approximately $50 at a 7-11 Store in Leesville, Louisiana. After a forcible abduction, she was put in the trunk of Thomas' borrowed car and driven to the Lake Vernon Spillway. Wilson was taken from the trunk and Johnson killed her with eight shots from a .22 rifle. When the 7-11 Store appeared unattended, there was a search of the area and Ms. Wilson's body was found that evening. Subsequent investigation led to the apprehension and arrest of the four young men. Arresting officers advised Deputy Hagan that they had read Johnson his Miranda rights when he was arrested at approximately 6:03 P.M. on February 20, 1977.
Johnson was later advised of his rights by Hagan on at least three occasions; he signed a waiver of his rights on two of them; and, in the presence of at least six law enforcement officers, he signed an oral inculpatory statement reduced to writing, admitting his presence at the lake and store, at least as "lookout man", but denying that he fired any of the shots. A subsequent oral statement admitted greater complicity: presence inside the store during the robbery; and the firing of two shots before Jay "Jailhouse" Williams took the rifle and fired five more shots.
Johnson took the stand at both the hearing on his motion to suppress and at trial for the limited purpose of denying that he had ever made the inculpatory statement introduced by the prosecution. He repeatedly insisted that he did not say anything because he did not know anything, that he was at home at the time of the incident, and that he signed the statement upon the insistence of law enforcement officers. The trial judge denied the motion to suppress.
At trial, co-defendant Robert White, who had a lengthy juvenile record, testified for the state.[4] His testimony dove-tailed with Johnson's signed confession, except that the responsibility for firing all eight rifle shots was placed on Johnson.
Because he was a juvenile at the time of the confession and had not received assistance of counsel or advice from an informed adult interested in his welfare, defendant asserts that the decision of the trial judge overruling his motion to suppress should be reversed; his conviction vacated and the case remanded for a new trial.[5]Dino, supra.
Although defendant was only slightly over sixteen years old at the time of the confession, he was a "street-wise" youngster *346 with a juvenile record. Before being expelled for fighting, he attended the tenth grade at Leesville High School. He was at the Louisiana Training Institute (LTI) for juvenile delinquents during his fifth and sixth grades, where he received mandatory schooling.
Dino held:
"[T]he purported waiver by a juvenile must be adjudged ineffective upon the failure by the State to establish any of three prerequisites to waiver, viz., that the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was interested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile." Dino, supra, at p. 594.
Prior to Dino, the "totality of circumstances" test was used to determine whether a juvenile had knowingly and intelligently waived his rights.[6] In Collum, supra, Dino was made inapplicable to cases tried prior to June 15, 1978, the date Dino became final. The "totality of circumstances" test was the prevailing rule throughout the nation at that time.[7]Collum was modeled after the Supreme Court's decision in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Johnson held that the court's prior opinions in Escobedo[8] and Miranda[9] would apply only to cases tried after their effective dates, noting three criteria: (1) the purpose of the new standards; (2) the reliance placed by the authorities on the older standards; and (3) the impact that retroactive application of the new standards might have on the administration of justice.[10]
The Dino rules are not meant to avoid a risk of convicting an innocent person.[11] At the pre-arraignment stage, counsel at most could advise the arrestee not to answer any questions or bargain for a plea. Either service is of more use to a guilty party than to an innocent one.[12] The Dino rule is a prophylactic one similar to Miranda. It does not go to the integrity of the fact-finding process; rather, it serves the same purpose as the voluntariness test and the Miranda rule. Under the prior voluntariness test, there is no rigid list of factors to be considered. Although it is an important factor, age is but one of them. Reliance by law enforcement officials in Louisiana on prior decisions was justifiable. Collum states:
"[A]n extremely detrimental effect upon the administration of justice would result from a retroactive application of the Dino rule requiring the release of all persons convicted on the basis of custodial interrogations under the totality of circumstances test." 365 So.2d 1272 at 1277.
This position has been confirmed in several subsequent decisions.[13] Because defendant's statement was voluntary and the Dino guidelines had not been promulgated at the time of the custodial interrogation, Dino does not apply. Review, therefore, must be based on the "totality of circumstances" or "voluntariness" rule.
*347 Under the older rule, at the hearing on defendant's motion to suppress, the state bore the burden of proving beyond a reasonable doubt the free and voluntary nature of the inculpatory statements made by the defendant and his understanding of the consequences from the waiver. LSA-R.S. 15:451; former LSA-C.Cr.P. art. 703(C); State v. Hills, 354 So.2d 186 (La., 1977); State v. Collum, supra. The state cannot simply rely on general testimony of officers not present that they witnessed no coercion, intimidation, or other undue influence. State v. Simmons, 328 So.2d 149, 152 (La., 1976). Rather, the state is required to rebut specific testimony which defendant introduces alleging coercive measures or intimidation. Hills, supra, at p. 189. There is no claim here that defendant was beaten, denied sleep, food or water, promised anything as an incentive, or induced to confess on any of these grounds. Although defendant corroborated much of the testimony of four of the six law enforcement officers who were present during the alleged confession, he contends that he never made a statement and that the law enforcement officers made the "confession" up out of whole cloth, and typed the "answers" to their own questions as they went along. Defendant further contends that he can neither read nor write (except for his own name), the statement was not read to him or by him before he signed, and that he signed this piece of paper after officers made allusions that he would "fry"[14] if he did not. The testimony of the officers, particularly Deputy Hagan, and the documents produced indicate otherwise.
Hagan advised Johnson of his Miranda rights as soon as he was brought to the station on February 20 at 6:29 P.M. When Johnson refused to sign an acknowledgement, he was taken upstairs and booked; Hagan went upstairs and again read Johnson his rights at 6:40 P.M., and Johnson then signed a waiver of the right to an attorney. He said that he did not have any knowledge about the crime. After defendant requested that Hagan speak with him on the morning of February 23, Hagan again advised Johnson of his rights at 8:50 A.M. and Johnson signed a waiver. Johnson then made the oral inculpatory statement, which he repeated in a question and answer session lasting from 8:50 A.M. to 12:17 P.M., typed by Hagan and Officer Magee. No tape recording was made.[15] During this session, at least six law enforcement officers were present, all dressed in civilian clothes, and no weapons were displayed. The four testifying officers stated that during the two hour session, defendant was given at least five cigarettes, offered something to drink, and the opportunity to use the restroom; that defendant appeared composed, not nervous or afraid, and at no time did he ask to stop the conversation. Hagan testified that he did not recall Johnson ever asking to see his mother. The officers denied making any threats, promises, or references to the electric chair. After completion of the typed statement, Johnson took it, looked it over for several minutes, signed it at the bottom of each page, and initialled the numerous places where an "X" had been placed to indicate a typographical error. About an hour later, Johnson called for Hagan to return, indicating that he had not been entirely truthful, and made an oral modification of the earlier written statement, placing himself inside the 7-11 during the robbery and stating that he had shot the victim two times, after which Jay "Jailhouse" Williams had taken the rifle and shot her five more times. Johnson's mother arrived at the station shortly thereafter; he made no more statements and did not sign a corrected statement.
Defendant's account of the same events at the suppression hearing corroborated, in part, the testimony of the law enforcement officers. However, he denied that he was *348 read his rights a third time (on the morning of the statement), denied signing the waiver form (although his signature appears on it), and denied making a statement altogether. Although he attended the tenth grade, he claims he cannot read or write other than his name and "one [or] two letter words" and reads only comic books, looking at the pictures. He asserted that the two men typed the statement following their own oral answers to their own questions, and he does not know where they got their information. The statement was not read to him before he signed it; he did not read it because he cannot read, and he signed it only because they told him: "I'm going to the electric chair, it be more easy on me."[16] He further disclaimed knowing the meaning of the right to remain silent.
The trial judge questioned Johnson about his asking for an attorney before he signed the confession:
"BY THE COURT:
"Q. Frederick, at any time before you signed the alleged confession or this statementdid you request Mr. Hagan or any of the other officers to get you an attorney or that you wanted to see a lawyer?
"A. Yes sir. Wanted to see my momma...
"Q. You did, now be careful about your answer. Did you do that?
"A. Sir?
"Q. Did you ask to see a lawyer?
"A. I didn't see my mom, she get me a lawyer.
"Q. All right, did these officers or any of them tell you that you had the right to an attorney?
"A. Yes sir, when I first came in.
"Q. All right, but you did not request to see an attorney, is that correct?
"A. Yes sir, I wanted to see my momma so she could get me an an lawyer.
BY THE COURT:
"Okay, that's all I have. (Tr., Vol. 1, p. 110).
These allegations by defendant that he had indicated he wanted a lawyer were refuted by Deputy Hagan and Trooper Wilson.
At the hearing on the motion to suppress, Deputy Hagan testified that at no time did defendant ask to stop or quit the interview;[17] that at no time prior to or during the statement did he recall defendant telling Hagan or anyone else that he wanted to see his mother; that at no time did defendant ever tell Hagan that he wanted an attorney.[18] The trial court concluded that Hagan had read defendant's rights to him three times prior to defendant's statement.[19]
Trooper Wilson, testifying at the motion to suppress, said that defendant was in a normal mood, spoke freely to Hagan in response to his questions, indicated that no one had forced, coerced or intimidated him, and that his statement was made freely and voluntarily. Wilson heard no threats or promises made.[20]
At trial, Hagan further testified that he had told defendant he had the right to consult with a lawyer and made the telephone available to him on several different occasions.[21] Defendant never indicated he wanted to discontinue talking or have an attorney present.[22]
At trial, Trooper Wilson testified that defendant was told that he had the right to a lawyer when he was read his rights, but defendant never indicated he wanted a lawyer.[23]
Chief Deputy Magee testified at trial that defendant appeared to be making the statement of his own volition, freely and *349 voluntarily, in a normal conversation, and never asked to discontinue talking to the officers.[24]
Juvenile Officer Jackson testified at trial that he had witnessed the third rights statement, not the confession. When defendant volunteered the correcting statement, Jackson asked him whether he wanted his rights read to him again. Defendant replied, no, I know what they are.[25]
The trial judge who presided at the suppression hearing concluded that Johnson's confession was freely and voluntarily given. He discounted defendant's assertions that he could neither read nor write based on the record showing that he had attended school at least through part of the tenth grade. The trial court's decision is assigned great weight, as it depends largely upon credibility determinations on many of the crucial matters which were resolved in favor of a finding that the confession was free and voluntary. State v. Collum, supra; State v. Ross, 343 So.2d 722 (La., 1977).
Under the totality of the circumstances surrounding defendant's confession, the record establishes that the state met its burden of proving beyond a reasonable doubt that defendant's statement was voluntary and made with an understanding of the consequences of his waiver. The conviction and sentence are therefore affirmed.
AFFIRMED.
LEMMON, J., concurs.
DIXON, C.J., respectfully dissents.
CALOGERO, J., dissents.
DENNIS, J., dissents with reasons.
NOTES
[1] 365 So.2d 1272 (La., 1978), cert. den. 444 U.S. 882, 100 S.Ct. 171, 62 L.Ed.2d 111 (1979).
[2] 359 So.2d 586 (La., 1978), cert. den. 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978).
[3] Born December 8, 1960.
[4] He had pled guilty to conspiracy to commit murder and been sentenced to fifteen years in prison.
[5] LSA-R.S. 15:451 provides:

"Before what purposes to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
Former LSA-C.Cr.P. art. 703 C, as it read in 1977, provides:
"C. On the trial of a motion to suppress filed under the provisions of this article the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving that a purported written confession or written inculpatory statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
[6] State v. Hall, 350 So.2d 141 (La., 1977); State v. Ross, 343 So.2d 722 (La., 1977); State v. Sylvester, 298 So.2d 807 (La., 1974); State v. Melanson, 259 So.2d 609 (La.App. 4 Cir., 1972).
[7] West v. United States, 399 F.2d 467 (5th Cir., 1968), cert. den. 393 U.S. 1102, 89 S.Ct. 903, 21 L.Ed.2d 795 (1969); People v. Lara, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202 (1967), cert. den. 392 U.S. 945, 88 S.Ct. 2303, 20 L.Ed.2d 1407 (1968); American Law Institute, Model Code of Pre-Arraignment Procedure, pp. 361-362, n. 4 (1975).
[8] Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).
[9] Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] State v. Collum, 365 So.2d 1272, 1275 (La., 1978).
[11] State v. Collum, supra, at p. 1276.
[12] State v. Collum, supra, at p. 1276.
[13] State v. Kent, 391 So.2d 429 (La., 1981); State v. Harris, 383 So.2d 1 (La., 1980); State v. Lewis, 377 So.2d 1322 (La.App. 1 Cir. 1979); State v. Kent, 371 So.2d 1319 (La., 1979).
[14] Tr., Vol. 1, pp. 93, 99, 106.
[15] Tape recordings were made of the statements/confessions of co-defendants White and Thomas, which were also taken by Deputy Hagan.
[16] Tr., Vol. 1, p. 107. This is the only allegation of coercion/intimidation.
[17] Tr., Vol. 1, p. 80.
[18] Tr., Vol. 1, pp. 111-112.
[19] Tr., Vol. 1, pp. 113-114.
[20] Tr., Vol. 1, pp. 88-89.
[21] Tr., Vol. 2, pp. 317-318.
[22] Tr., Vol. 2, p. 330.
[23] Tr., Vol. 2, p. 338.
[24] Tr., Vol. 2, p. 348.
[25] "A. I believe, sir, that I witnessed the rights statement, not the statement itself. Yes, I did. On the back. I'm sorry. Yes.

"Q. All right, now, sir, in reference to that statement, sir, do you know when it was concluded?
"A. It was concluded at 12:17 P.M. that afternoon, on the 23rd of February of '77.
"Q. All right, sir. After this statement was made, did you see Mr. Johnson sign it?
"A. Yes, I did.
"Q. All right, sir. Did you hear anyone read it to him?
"A. Yes, I did.
"Q. Do you know who that person was?
"A. Detective Hagan read him the statement.
"Q. You heard him read the entire statement to him?
"A. Yes sir.
"Q. All right, sir. Now, after that statement, do you know what time they finished making that statement?
"A. Yes sir, the statement was completed at 12:17 that day.
"Q. All right, sir. Now, subsequent to the time that statement was made, did you have an occasion to talk to Freddie again, sir?
"A. Yes, I did.
"Q. And where was that, sir?
"A. Well, it was in mymy office, adjacent to my office in the juvenile detention cell.
"Q. And about what time was it?
"A. Approximately 1:30.
"Q. All right, sir, and what was the occasion for your talking to Mr. Freddie Johnson again?
"A. Mr. Steve Woods and I had been out of the office, and we were walking back into my office, and Freddie had called for me.
"Q. Where was Freddie at this time?
"A. Freddie was in the juvenile cell, adjacent to my office.
"Q. All right, sir, and what happened?
"A. I asked him what he wanted, and he said to talk to me. I walked into my office and got the key to the cell, and walked over and opened the door and asked him what he wanted, and he said he wanted to talk to the deputies again. He wanted toif he was going to give a statement, he wanted to make sure that everything was in it, and that he had not been truthful in the statement he had just given them.
"Q. Is this what he had told you?
"A. Yes, it is.
"Q. All right, sir. Without telling us what he might have told you, at that point, did you or Mr. Woods or anyeither one of you, advise him of his rights or remind him of his rights?
"A. Yes sir, I did.
"Q. All right. Exactly what did you do and how did you do it?
"A. I stopped him at that point. I said Freddie, before you say anything, you know I have to advise you of your rights and, I said, do you want me to read them to you again, or do you remember what they are. And he said, no, I don't want you to read my rights. I know what they are, and then he went right on in to telling me the rest of the story. * * *" (Tr., Vol. 2, pp. 368-370).